UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| RANDY G O'NEAL | CASE NO. 19-cv-1472 |
| -vs- | JUDGE DRELL |
| USA | MAGISTRATE JUDGE PEREZ-MONTES |

## MEMORANDUM RULING

Before the court is a claim for monetary damages brought by plaintiff Randy O'Neal ("O'Neal") against the United States through United States Postal Service ("USPS") pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et. seq.* We have jurisdiction because O'Neal seeks monetary damages arising from an automobile collision with a USPS vehicle operated by Troy Meyer (Meyer) who was in the course and scope of his employment with USPS. 28 USC § 1346(b)(1). A bench trial was held before the undersigned on December 20, 2021 during which the parties presented evidence pertaining to allocation of fault and quantum of damages.

I.  Allocation of Fault

A. Relevant Facts

On September 25, 2017, O'Neal, age 58, was operating his 2011 Ford Mustang ("Mustang") on Rigolette (pronounced "rō-gəlē") Road in Pineville, Louisiana returning home from his nearby workplace shortly after 5:00 P.M. The road winds through a neighborhood that is abundant with tall trees creating blind curves. As a

result, parts of the road, and in particular where the accident occurred, were bifurcated by two solid yellow lines representing a "no passing" zone. Also typical of country roads, a few additional feet of pavement flanked by a drainage ditch provided a shoulder. Ahead of O'Neal and around a right hand curve, Meyer was delivering mail in a common Grumman style LLV mail truck ("LLV") similar to what most people envision when they think of a USPS mail truck. Meyer, an inexperienced USPS driver, pulled over onto the right hand shoulder as much as the shoulder would allow with his flashers on and delivered mail into a mailbox at the shoulder's edge. His next delivery was a package requiring delivery to the front door of the house directly across the street.

Meyer claims to have turned the steering wheel towards the left, activated his turning signal, checked his mirrors, checked future delivery assignments, and again checked his mirrors before accelerating to make a left hand turn from a dead stop without returning into the lane of travel before turning. Meyer further claims he did not see O'Neal's attempt to pass.

O'Neal claims to have approached Meyer's LLV from behind, to have come to a halt before attempting to pass on the left, and to have honked his horn as he attempted to pass. Nonetheless, as Meyer accelerated, the front left corner of the LLV struck the passenger side door of O'Neal's Mustang. Further, the forward momentum of the Mustang caused the front left corner of the LLV to scrape the Mustang's side further damaging the door, the right rear panel and the accompanying rear wheel well. The police report indicated that O'Neal's Mustang passed Meyer's

LLV at 15 miles per hour and that Meyer's LLV turned into the O'Neal's Mustang at 5 miles per hour. Doc. 51-12. These speeds are not disputed.

### B. Analysis

Because the accident occurred in Louisiana, Louisiana law applies. 28 USC § 1346(b)(1).

> In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

<u>Watson v. State Farm Fire & Cas. Ins. Co.</u>, 469 So. 2d 967, 974 (La. 1985). Neither party argues any diminished capacity of Meyer or O'Neal nor the existence of extenuating circumstances. The parties' arguments on liability primarily focus on the awareness of danger and the risk created by the other's conduct.

The statutory duties of a passing motorist are found in La. R. S. 32:73 and 32:75. The jurisprudence applying these statutes teaches that a passing driver "has the duty to ascertain before attempting to pass a preceding vehicle that from all the circumstances of traffic, lay of the land, and conditions of the roadway, the passing can be completed with safety." <u>Palmieri v. Frierson</u>, 288 So. 2d 620, 623 (La. 1974). The government argues that O'Neal's passing maneuver was inherently dangerous as evidenced by those duties. In addition, it argues that the passing maneuver in a no-passing zone is even more dangerous as evidenced by its prohibition under La. R.

S. 32:77(B). In support, the government cites Roberts v. Robicheaux, which similarly involves a left turning motorist and a passing motorist. 896 So. 2d 1232, 2004-1405 (La. App. 3 Cir. 3/2/05), writ denied, 902 So. 2d 1021, 2005-0792 (La. 5/13/05). In Roberts, the Louisiana Third Circuit reasoned that a left turning motorist may reasonably rely on a following motorist to abide by the existence of a no-passing zone. Id. at 1234-1235 (citing Natchitoches Motors v. Travelers Ins. Co., 372 So.2d 811, 813–14 (La. App. 3rd Cir. 1979)). "[T]he sole basis for which both the trial court and [the Third Circuit] found the passing motorist was at fault" was the existence of a no-passing zone through which the passing motorist attempted to pass. See Plunkett v. Geis, 896 So. 2d 1232, 2008-230 (La. App. 3 Cir. 12/3/08) (distinguishing Roberts, 896 So. 2d 1232). Ultimately, the Roberts court assigned the passing motorist 75% of the fault, upsetting the trial court's equal 50% allocation.

O'Neal responds that a violation of La. R. S. 32:77(B) does not equate to negligence when the accident that occurred is not within the scope of protection of a statute and cites to Beraud v. Allstate Ins. Co., which also involved a left turning motorist and a passing motorist. 251 So. 2d 402, 403 (La. App. 1st Cir. 1971) (citing Dixie Drive it Yourself System New Orleans Co. v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962) *superseded by statute on other grounds*. In Beraud, the court found that the purpose of the no-passing zone at the scene of an accident is limited to preventing accidents with oncoming traffic. Id. at 403-404. Because of this limited purpose espoused in Beraud, O'Neal urges us to accept that violations of La. R. S. 32:77(B) may only equate to negligence in an accident with oncoming traffic,

and therefore they do not equate to negligence in an accident like this one with a left turning motorist. This analysis stands in direct opposition to <u>Roberts</u> which found that left turning motorist may rely on following motorist abiding by no-passing zones. <u>Roberts</u>, at 1234-1235 (citing <u>Natchitoches Motors v. Travelers Ins. Co.</u>, 372 So.2d 811, 813–14 (La. App. 3rd Cir. 1979)). In further arguing Meyer's fault, O'Neal claims that Meyer did not continuously signal for 100 feet before turning left as required by Louisiana Revised Statute 32:104(C).

Without resolving the conflict presented by these two cases, we find these cases and the applicable traffic statutes to be more informative than dispositive because they do not accurately capture the unique circumstances that have arisen here as O'Neal undertook his passing maneuver around the mail truck ostensibly stopped to make a delivery. For example, delivery drivers are regularly passed when making frequent stops. This reality is not altered by the existence of a no-passing zone. Likewise, continuous signaling for 100 feet before turning could undermine the use of emergency flashers required of 32:104(C) to signal a stop. Continuous signaling could also confuse following drivers of the mail driver's intent when a mail driver is required to pull over opposite the direction of signaling within that 100 feet, as is the case here.

Accordingly, delivery drivers must constantly be aware of the possibility of potentially passing traffic when stopped to make a delivery and may not simply rely on the existence of a no-passing zone. Likewise, a passing motorist should know that mail drivers frequently (and often abruptly) stop and go, that mail drivers may elect

to service one side of the road or both, that deliveries within 100 feet of each other would undermine the proper use of any signal, and that a mail carrier is laden with the dual duty of safe motor vehicle operation and mail delivery (unlike an ordinary motorist whose main duty is safe motor vehicle operation).

Under this analysis, we agree with the government that passing is inherently dangerous but disagree that O'Neal's violation of the no-passing zone equates to his sole fault such that Meyer could have blindly relied on the no-passing zone. O'Neal argues that a left-hand turn is also inherently dangerous, with which we also agree. The duty imposed upon both drivers is significant.

Analyzing awareness of danger, we find that O'Neal's conduct involved a required awareness of danger because he knowingly passed a stopped mail vehicle on an active delivery route. Meyer's conduct, however, was inadvertent as he claims to have never seen O'Neal's vehicle prior to impact. See Guitreau v. City of Gonzales, 2013 WL 557018, *4, 2012-0794 (La. App. 1 Cir. 2/13/13) ("Not only did [the passing motorist]'s conduct create a greater risk of harm than [the left turning motorist], it also was intentional conduct, whereas [the left turning motorist] was merely inattentive."). O'Neal argues that Meyer should have seen O'Neal in the LLV's mirrors. We agree with two caveats. First, which favors O'Neal, Meyer was an inexperienced driver working a new route. A more experienced driver likely would have more carefully checked the mirrors to ensure the way was clear before turning to cross the street after making a delivery. Second, which favors Meyer, Meyer's vehicle was resting on the right hand side of the road in and around a blind right

6

hand curve. Meyer could only have seen O'Neal's approaching vehicle after O'Neal rounded the curve sufficiently to come within view of the LLV's left side mirrors. In effect, there is a very limited window of time through which Meyer could have seen any following vehicle. Here we are aware that O'Neal claims to have actually waited behind the Meyer's vehicle for a time before checking for a clear way and initiating his passing maneuver. This fact required him to be sure the way was clear, and he in fact had time to determine whether the way was clear.

Along the lines of both the risk created and an awareness of danger, there is a dispute of fact as to whether Meyer activated the left turning signal of the LLV. Meyer claims to have activated his emergency flashers when he pulled over onto the right hand shoulder. He then claims to have cocked the wheel to the left and activated the left turn signal in a single motion, checked his mail trays, and checked his mirrors before attempting to turn left. Meyer also claims, and O'Neal does not dispute, that activating the turn signal deactivates the emergency flashers. If we find that Meyer did not activate his turn signal, then Meyer's conduct creates a risk that is clearly dangerous. On the other hand, if Meyer did activate his turn signal, O'Neal may have seen a set of flashing lights and assumed the lights remained in the emergency flashing state. In such a case, we would note O'Neal ignored a turn signal he should have seen also creating a risk that is clearly dangerous. But, we have no corroborating evidence to support either claim.

After thorough consideration, we find that (1) while Meyer and O'Neal had the duty to exhibit exceptional care, a mail truck that has stopped to make a delivery

must exhibit a higher degree of care before turning to cross the road to ensure there is no passing traffic, (2) O'Neal had knowledge of the risk created by his conduct, and (3) Meyer's conduct was at least inadvertent and at most inattentive, and therefore negligent. Accordingly, we find that the government is accountable for 50% of the damages O'Neal may claim, and O'Neal is accountable for the remainder of 50%.

## II. Quantum

### A. Relevant Facts

O'Neal filed suit on November 13, 2019. According to the complaint, O'Neal is seeking general damages in the form of past and future physical and mental pain and suffering, disability, and loss of quality of life, and specific damages in the form of past and future medical expenses, and property damage to and the loss of use of the Mustang.

O'Neal claims this accident on September 25, 2017 caused a cervical injury. Lacking health insurance and the financial means to seek immediate treatment, O'Neal elected to self-medicate with over the counter pain medications until November 14, 2017 when he sought treatment from his family doctor Dr. Robert Smith. During his visit with Dr. Smith, O'Neal complained of progressive pain in his neck and shoulders since the accident. Dr. Smith ordered x-ray and MRI images of O'Neal's cervical column. Dr. Smith also prescribed Norflex and Norco for pain relief and spasms and prednisone for inflammation.[1] On December 20, 2017, Dr. Smith

---

[1] Dr. Smith never suggested that O'Neal consider physical therapy or chiropractic care. According to his deposition testimony, Dr. Smith does not recommend physical therapy for cervical injuries and has never in twenty years of practice

reviewed the images, ordered nerve conduction studies, and referred O'Neal to neurosurgeon Dr. Erich Wolf.

Nerve conduction studies were performed, and the reviewing physician Dr. Sean Stehr recommended bilateral C5-6 facet injections, which O'Neal underwent on April 18, 2018. O'Neal followed up with Dr. Stehr on May 8, 2018 and reported less pain and improved function. Dr. Stehr then recommended C4, 5, and 6 medial branch blocks to determine whether O'Neal was a candidate for ablation, which O'Neal underwent on July 11, 2018. When O'Neal returned on July 16, 2018, Dr. Stehr recommended bilateral C4, 5, and 6 ablations.

On October 4, 2018, O'Neal saw Dr. Wolf who concurred with Dr. Stehr's nonsurgical treatments but opined that the effectiveness of these treatments would decline and within ten years would no longer be effective. Dr. Wolf ultimately recommended a C5-6 anterior cervical dissection and fusion. Dr. Wolf advised O'Neal that the surgery would require six or more weeks for recovery and could damage the esophagus and vocal cords requiring further recovery. This was particularly concerning for O'Neal because he sings for a local band and enjoys announcing football games and other events at Pineville High School and Louisiana Christian University, formerly Louisiana College. As a result, O'Neal elected to continue with Dr. Stehr's more conservative treatments.

---

referred recommended chiropractic care. The deposition testimony's of O'Neal's other treating physicians are devoid of any comment regarding physical therapy or chiropractic care.

O'Neal scheduled bilateral ablations and underwent right side ablations at C4, 5, and 6 on November 7, 2018. Left side ablations were scheduled for November 28, 2018 but postponed because O'Neal had difficulties with anesthesia. O'Neal claims that for personal reasons (such as finances) and uncontrollable reasons (such as the cancellation of elective surgeries during peaks in COVID-19 hospitalizations), the left side ablations were postponed.

On October 18, 2021 (nearly two years after the suit was filed and nearly three years after O'Neal underwent right side ablations of C4, 5, and 6) O'Neal underwent left side ablations of C4, 5, and 6. On November 11, 2021 O'Neal last saw Dr. Wolf, who opined that O'Neal's injury would likely require fusion at multiple levels. At the bench trial held December 20, 2021, three witnesses testified to O'Neal's declining quality of life. O'Neal testified to the same and the medical decisions made along the way. During the bench trial it became clear that O'Neal's attorneys had advanced medical expenses as part of their representation agreement.

### B. Analysis

In Louisiana, delictual actions are governed by La. C. C. Arts. 2315 and 2316, under which a tortfeasor must compensate a tort victim for all the damages occasioned by the tortfeasor, including via negligence or fault. Compensatory damages include special damages with a relatively certain market value and general damages which are inherently speculative.

Regarding special damages, O'Neal has inccurred $35,109.94 in past medical expenses. Further, repairs to his vehicle not yet completed were estimated to cost

$4,611.59. O'Neal also seeks an additional $150,000 for likely repeated ablation therapy for ten years. This value derives from claims that oblations provide relief for twelve to eighteen months, that O'Neal will likely require a bilateral ablation at least once a year, that O'Neal will refrain from surgery until the ablations no longer provide relief which is estimated at ten years in O'Neal's case, and that bilateral ablations cost approximately $15,000.

However, we note that there exists a credibility issue that undermines this analysis and the amount of pain in which O'Neal claims to be. Primarily, O'Neal was originally scheduled to receive a bilateral ablation, each side within a month of each other, and instead he received left and right side ablations three years apart. This is anomalous. The government pressed O'Neal on the issue of why he did not get the left side ablation earlier and why he has not obtained another right-side ablation. O'Neal blamed his finances and postponement of elective procedures due to the occurrence of Hurricane Laura in late August 2020 and the pandemic.

As it pertains to his finances, O'Neal did in fact attempt to undergo a left side ablation on November 28, 2018, which was terminated on account of his movement under anesthesia, not financial issues. Then, he waited until October 18, 2021, two months before trial, to obtain a left side ablation for the first time. Additionally, at the time of trail O'Neal has not obtained a second right side ablation. In other words, three years and two months have passed since O'Neal obtained a right-side ablation, a procedure that is only supposed to provide relief for twelve to eighteen months. However, as we noted above, O'Neal's counsel covered the cost of medical expenses

O'Neal encountered as part of counsel's representation. Thus, we presume he has had the means to afford the procedures since November 13, 2019 when suit was filed.[2] As it pertains to the postponement of elective surgeries on account of Hurricane Laura and surges in the pandemic, those events may have prevented elective surgeries at various time, but there has been ample time beyond those events to schedule elective surgeries as well.

In addition to the medical expenses listed above, O'Neal also requests an additional $56,764.07 in special damages for a proposed two level fusion as recommended by Dr. Wolf, or alternatively $49,512.65 for a single level fusion. O'Neal plans on postponing this procedure for as long as possible. He has grave concerns about the effects of neck surgery on his singing and announcing careers and, so, there is a real possibility tis extensive and invasive surgery will never occur.

Regarding general damages, O'Neal first argues the application of Collatt v. Boudreaux, 2019 WL 6482247, 2019-103 (La. App. 3 Cir. 11/25/19) wherein the Louisiana Third Circuit increased a jury's award of $180,000 to $400,000, based upon plaintiff's twenty months of cervical and lumbar pain prior to a two level fusion and at least three years of pain after surgery at the time of trial. The two level fusion resulted in considerable pain requiring medication and caused additional pain in the form of temporomandibular joint dysfunction. We find this case is distinguishable from the instant for several reasons. The Collatt plaintiff actually obtained a two

---

[2] It is not inappropriate for case related expenses, including medical expenses, to be advanced by counsel. Our credibility concern surrounds the timing of O'Neal's treatment.

level cervical fusion, and, in all likelihood based on the medical testimony, would also required a lumbar fusion. Collatt, 2019 WL 6482247, *11. Further, the general damages award was based in part on the failure of the two-level cervical fusion to abate plaintiff's pain. Id. Because O'Neal has yet to obtain surgery for treatment, we have no means of evaluating its success. Further, the plaintiff in Collatt was bedridden with "excruciating" pre-surgery pain such that she could not perform basic operations such as opening a water bottle. Her doctor assigned a 50%-60% total body impairment, and she was awarded $62,000 in past and future lost wages, among other damages. Id. at *3; Collatt v. Boudreaux, 2019 WL 1143774, *1, 2019-103 (La. App. 3 Cir. 3/13/19). O'Neal claims he can no longer pick up heavy objects such as an armful of groceries or bend over to pick up a full laundry basket. However, O'Neal's pain has not prevented him from working and engaging in his singing activities. Nor is the pain so debilitating that he is bedridden.

O'Neal also argues application of Lantier v. Caskey wherein the Louisiana Third Circuit affirmed the jury's award of $675,000 in general damages after an accident which caused cervical and shoulder injury. 308 So.3d 758, 2019-687 (La. App. 3 Cir. 11/12/20). The cervical injury was treated by a cervical epidural steroid injection and a facet injection and the plaintiff's treating physician opined that ablations and a two level cervical fusion would be necessary. The treating physician also opined that the shoulder injury would require arthroscopic surgery. The plaintiff was only 21 years old at the time of the accident and her quality of life significantly changed. Id. at 769. The plaintiff testified that prior to the accident she was a

"tomboy" enjoying regular activities including, but not limited to, swimming and tennis and loved "horsing around" with her niece. Id. After the accident, the plaintiff's injury prevented these activities as well as other basic functions such as placing her hair in a ponytail or throwing a towel over a shower rod to dry. Id. Further, the plaintiff's ex-fiancé, who was familiar with the plaintiff before and after the accident, testified to the plaintiff's persistent pain and changes in lifestyle. Id. The ex-fiancé also testified to a belief that the plaintiff had depression, which was not diagnosed, after finding the plaintiff hysterically crying on occasion. Id. Of the $675,000 awarded by the jury, $85,000 was allocated to past pain and suffering, $340,000 was allocated to future pain and suffering and another $150,000 to loss of enjoyment of life, and the Louisiana Third Circuit affirmed the award in part relying on the plaintiff's young age and the diminished quality of life the young plaintiff would have to bear for the remainder of her years. Id. at 766.

In the instant case, O'Neal does not claim a shoulder injury, and there is a credibility issue regarding the severity of the pain O'Neal experiences. Lastly, O'Neal's age at the time of the accident must be considered. We agree with O'Neal that 58, his age at the time of the accident, is not particularly old and that many people have the prospect of a number of good quality years past 58. Nonetheless, the Lantier plaintiff was 21 at the time of the accident and the Louisiana Third Circuit's approval of the jury award clearly took that young age, or more importantly the long term effects of her injury on her life, into consideration. Id.

O'Neal's third argued case is Williams v. City of New Orleans, 897 So. 2d 744, 2004-0655 (La. App. 4 Cir. 1/19/05), *writ denied sub nom.* In Williams, the plaintiff was a switchman for the New Orleans Public Belt railroad operated by the defendant, and on April 27, 2000, the plaintiff was on a moving locomotive when it crashed into the rear of a parked locomotive. Id. at 746. As a result of the accident, the plaintiff sustained a "serious" back and neck injury and was taken to the emergency room. Id. at 746, n.1. Subsequently, the plaintiff attended physical therapy and sought orthopedic treatment receiving steroid and epidural injections. Id. However, by June 27, 2001 the plaintiff's orthopedist opined that separate back and neck surgeries may be required. Id. Cervical facet injections were administered until the plaintiff's insurance approved the surgery. Id. On March 13, 2002, the plaintiff underwent a two level cervical fusion. Id. By the time of the trial, the plaintiff was still in pain and had yet to undergo back surgery. Id. The trial court awarded the plaintiff $350,000 in general damages. Id. The Louisiana Fourth Circuit opinion affirmed the trial judge's award for future lost earning capacity, which O'Neal does not seek, and does not provide any analysis into the award for general damages.

Our ability to compare O'Neal's case to the Louisiana Fourth Circuit's opinion in Williams is limited to the injury sustained, the treatment received, and the success of that treatment. First, the Williams plaintiff sustained injuries to both his neck and his back each requiring treatment whereas O'Neal claims to have sustained only an injury to his neck. Second (as was similarly distinguishing from Collatt) the

plaintiff underwent at least some portion of the recommended surgeries. In comparison, O'Neal seeks ablations to delay surgery as long as possible.

Fourth and finally, O'Neal argues the applicability of Sanford v. Kostamayer Const. Co., wherein the trial judge denied remittitur to less than §200,000 from a $350,000 jury award in general damages pursuant to a Jones Act claim. 891 F. Sup. 1201 (E.D. La. 1995). The plaintiff was a seaman working on the defendant's barge when he fell and sustained a cervical injury. Id. at 1203. The plaintiff underwent a cervical fusion and was assigned a 15-20% disability to his body as a whole. Id. At trial, the jury awarded the plaintiff $250,000 for pain and suffering and an additional $100,000 for mental pain and suffering. The district court in denying remittitur found the award for $250,000 for pain and suffering was consistent with the disability rating as compared with other cases. Id. at 1208 ("[P]laintiff's anatomical disability rating of 15 to 20% as a whole is higher than that of the plaintiffs in the Williams [v. Chevron, 875 F.2d 501 (5th Cir. 1989)], Holmes [v. J. Ray McDermott & Co., Inc., 734 F.2d 1110 (5th Cir. 1984)] or Ellis [v. Dover Elevator Company, 597 So.2d 1 (La. App. 4th Cir. 1992)] cases."). Regarding the latter award of $100,000 for mental pain and suffering, the district court found the award was supported by evidence that the "plaintiff always wanted to work for [the] defendant because his family members had worked for [the] defendant" and the injury, in tandem with the plaintiff's education, relegated the plaintiff to be a "snack delivery driver." Sanford, 891 F. Supp. at 1208-09. Compared to Sandford, O'Neil has yet to undergo surgery and the evidence

presents no disability rating for comparative analysis. Lastly, O'Neil's occupation in radio has not been jeopardized by the accident.

Despite these distinguishing features, O'Neal presented himself as a credible witness during the bench trial. The Court observed the stiffness of his neck as he responded to questions that required the turning of his head. However, as noted above, at trial more than three years have passed since he received a right side ablation, a procedure that should only provide relief for eighteen months max according to his treating physicians. While the left side ablation obtained months before trial most likely provided a degree of relief, he was past due for a right side ablation according to his doctors and the damage awards he seeks. Nonetheless, he does claim the ablations have provided significant relief. Thus, we find that if he has the means to and receives timely ablations then the magnitude of his future pain and suffering presumably will be less than the magnitude of his past pain and suffering.

We must also consider that O'Neil may well never have surgery to seek resolution of his pain. This fact is cause for concern regarding both special and general damages. In terms of special damages, the value of ten bilateral ablations at $150,000 is roughly three times as much as a two level cervical fusion at $56,764.07. Per general damages, the magnitude of O'Neal's future pain and suffering, mental anguish, and diminished quality of life without surgery presumably eclipses the magnitude of the same abated by surgery. But we also recognize the potential for surgery to result in a diminished quality of life if surgery were to prevent O'Neal from singing or radio announcing during an unpredictable recovery period.

### III. Conclusion

For all of the reasons express above, we find that O'Neal is entitled to the following damages:

Special Damages

| | |
|---|---|
| Past Medical Expenses | $35,109.94 |
| Future Medical Expenses | ⊛$206,764.07 |
| Vehicle Property Damage | $4,611.59 |

General Damages inclusive of past and future pain, suffering, anguish, and diminished quality of life                                        $260,000.00

Total Damages                                        $506,485.60

All damages awards are to be reduced by 50% in consideration of O'Neal's percentage of fault. A judgment in accordance with these reasons will be signed.

SIGNED this 15 day of February, 2022.

DEE D. DRELL, JUDGE
UNITED STATES DISTRICT COURT

---

⊛ $150,000.00 for ten bilateral ablations and $56,764.07 for a two level cervical fusion